# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 16, 2013 Session

## STATE OF TENNESSEE v. TYLER JAMES REED

**Appeal from the Criminal Court for Sumner County**
**No. 174-2010     Dee David Gay, Judge**

**No. M2012-02542-CCA-R3-CD - Filed November 20, 2013**

Appellant, Tyler James Reed, stands convicted of felony murder committed in the perpetration of a burglary, aggravated burglary, and employment of a firearm with intent to go armed during the commission of a dangerous felony. The trial court sentenced him to life in prison for the murder conviction, six years for the aggravated burglary conviction, and six years for the firearm conviction, with all sentences to be served consecutively in the Tennessee Department of Correction. On appeal, appellant argues that (1) the trial court erred by denying his motion to suppress all of the statements he made on October 30, 2009, and the physical evidence obtained as a result of those statements; (2) the evidence was insufficient to support the murder and aggravated burglary convictions; (3) the trial court erred by failing to instruct the jury regarding self-defense and voluntary intoxication; and (4) he is entitled to a new trial due to prosecutorial misconduct. Following our careful review of the record, the arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Margaret E. Garner and Carrie W. Gasaway (on appeal); John E. Herbison, Edward T. Farmer, and Fletcher W. Long (at trial), Clarksville, Tennessee, for the appellant, Tyler James Reed.

Robert E. Cooper, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case involves the October 30, 2009 shooting death of Dickey Lassiter at his home in Sumner County, Tennessee. Appellant was arrested for the murder of the victim after being found in possession of a twelve-gauge shotgun while in a vehicle parked in the victim's driveway. The Sumner County grand jury indicted appellant for murder in the perpetration of a burglary, aggravated burglary, and employment of a firearm with intent to go armed during the commission of a dangerous felony.

### A. Motion to Suppress Hearing

Prior to his trial, appellant moved to suppress all of the statements he made to law enforcement officers throughout the day of October 30, 2009. In the motion, he argued, *inter alia*, that his initial detention was illegal and that his statements were illegally obtained. He further argued that any evidence obtained as a result of his seizure, including statements and physical evidence, should be excluded as fruit of the poisonous tree.

At the motion hearing, Sumner County Sheriff's Deputy Christopher Magee testified that on October 30, 2009, at approximately 4:20 a.m., he was dispatched to assist Sergeant Aaron Pickard on a "shots fired" call at a Hilton Lane address. By the time he arrived at the scene, he had been informed that the caller had seen "somebody laying [sic] in the floor," but the responding officers were initially unaware of the exact circumstances of the shooting. Deputy Magee speculated that it might have been a suicide.

Deputy Magee testified that he was the third officer to respond to the scene. He said that the driveway to the house was "a good mile long," and there was a stone wall through which the driveway ran.[1] Deputy Magee testified that Sergeant Pickard asked him to investigate a blue car parked in the driveway. The car was pointed toward Hilton Lane, away from the house, and it was on the Hilton Lane side of the stone wall. Deputy Magee parked his patrol car "nose-to-nose" with the blue car and used his "take-down lights," spot lights, and head lights "to light up the car." Deputy Magee testified that he saw movement in the vehicle, so he approached it with his weapon drawn. He observed a white male, later identified as appellant, "trying to get in between the seat and the floorboard" while "clutching a black or dark colored long gun." Deputy Magee ordered appellant to drop the weapon. He complied ten to fifteen seconds after the command. Appellant exited the vehicle, and Deputy Magee handcuffed him and performed a pat-down search for additional weapons. Deputy

---

[1] Pictures entered into evidence show that the stone wall circled the house.

Magee said that appellant was wearing a coat and a toboggan, and he was not wearing gloves. During the search, Deputy Magee found a cellular telephone, a wallet, and a single glove. Deputy Magee testified that he handcuffed appellant "[t]o detain him until we figured out what was going on."

Deputy Magee further testified that he did not advise appellant of his *Miranda* rights because he "didn't have any questions for him." Deputy Magee admitted that he asked appellant whether anyone else was with him, and he explained that he asked this question for purposes of officer safety. Appellant answered, "'No,'" to his question. Deputy Magee placed appellant in the back of his patrol car and left the window partially opened. Deputy Magee testified that several times, appellant said that "he needed to call his father." The second time, Deputy Magee told appellant to "just hang tight. There's going to be some people come [sic] talk to you." Deputy Magee testified, "[A]t that point, [appellant] looked up[,] and he said, 'I didn't mean to shoot that man[,] but I didn't want to get shot.'" Deputy Magee testified that appellant did not say anything else, and he did not ask appellant any other questions. Deputy Magee did not process the vehicle for evidence, and he left the gun where appellant had dropped it. He said that one of the detectives on the scene took custody of appellant.

The recording of the encounter between appellant and Deputy Magee, entered as an exhibit to the motion hearing, elucidates the exact conversation that occurred, which varies slightly from Deputy Magee's testimony. When appellant asked what time it was, Deputy Magee asked, "Why?" Appellant's response, while difficult to hear, was that his mother needed the car to go to work. Deputy Magee then asked, "And?" Appellant made a response, and Deputy Magee told him the time, five o'clock, at that point. Several minutes later, there was radio chatter regarding ambulance personnel and closing off the driveway to the house. Appellant asked Deputy Magee about calling his father and said that he needed to call his father because "it's an emergency." Deputy Magee responded, "So is what we're doing out here." There was more radio chatter before appellant asked Deputy Magee, "Is he going to be ok?" When Deputy Magee said, "I don't know," appellant stated, "I didn't mean to shoot that man, but I thought I was going to get shot myself." Deputy Magee responded, "Just stay put, alright?"

On cross-examination, Deputy Magee testified that before appellant was placed in the patrol car, Deputy Magee asked him what he was doing there. He further testified that appellant's first words to him were, "'I shouldn't have been here.'" Deputy Magee said that he received information that there was a deceased victim in the residence after he had placed appellant in the patrol car.

In response to questioning from the court, Deputy Magee testified about appellant's condition when he exited the car, describing him as "a little lethargic." He also said that appellant appeared "confused or dazed" and was sweating. Deputy Magee testified that appellant appeared to be under the influence of some substance because he had slurred speech, repeated himself several times, had dilated pupils, and was moving slowly.

Sergeant Aaron Pickard testified that he was the first to arrive at the victim's residence after receiving a dispatch that there had been shots fired there. He learned while he was en route that a person had been injured. When he arrived at the residence, he saw a blue Cadillac in the driveway. He shined a light into the vehicle but did not see anyone inside. He proceeded to the house and went inside. Sergeant Pickard said that he entered through an unlocked glass storm door on the front of the house. Inside, he smelled "burnt gunpowder" and saw several shotgun shells. He had begun speaking with James Isenberg, who had called 9-1-1, when he saw the victim lying in the floor. Mr. Isenberg told Sergeant Pickard that he had been upstairs when he heard a shot and heard the victim say, "'It's you, you son-of-a-b****.'" Sergeant Pickard said that he checked the victim for signs of life and asked Mr. Isenberg about the Cadillac in the driveway. Mr. Isenberg did not know anything about the vehicle. Sergeant Pickard said that at that point, he felt "like maybe something else was going – you know, we could be in danger then."

Sergeant Pickard testified that he asked over the radio for the next responding deputy to check the Cadillac. He learned that Deputy Magee found someone in the Cadillac. When he went outside, Sergeant Pickard saw Deputy Magee patting appellant down, and he ordered Deputy Magee to place appellant in his patrol car.

Sergeant Pickard further testified that Major Don Linzey, the chief of detectives, asked him to transport appellant to the jail.[2] Sergeant Pickard said that he did not initiate any conversation with appellant while appellant was in his car, but upon seeing a news van parked on Hilton Lane, appellant asked him "if his name was going to be on the news." Sergeant Pickard responded that no one knew appellant's name yet. Sergeant Pickard testified that appellant then said either "'I didn't want to kill that guy'" or "'I didn't want to have to kill that guy.'"[3] Sergeant Pickard transported appellant to the jail and then to Sumner Regional Hospital to have his blood drawn. Sergeant Pickard testified that appellant asked him whether he would get to school on time, and Sergeant Pickard responded that "he

---

[2] We note that this occurred after Major Linzey and Lieutenant Tarlecky obtained the 6:03 a.m. statement.

[3] The "dashcam" in Sergeant Pickard's patrol car recorded their interaction; however, the recording was not entered into evidence at the motion to suppress hearing. It was admitted into evidence at the trial.

probably wasn't going to make it." According to Sergeant Pickard, appellant did not appear to be under the influence of drugs or alcohol.

Major Linzey testified that he was the first detective to arrive at the crime scene. Sergeant Pickard briefed him on what he had learned to that point. Major Linzey testified that a nine millimeter pistol was found underneath the victim, and there was a bullet hole through a window in the front door. He found three shotgun shells in the residence, two spent and one unspent. Three shell casings from the nine millimeter pistol were found in a room adjacent to where the victim was found.

After viewing the crime scene, Major Linzey and Lieutenant Christopher Tarlecky attempted to speak with appellant. Lieutenant Tarlecky escorted appellant from Deputy Magee's vehicle to his own and placed appellant in the front seat. Lieutenant Tarlecky sat in the front as well, and Major Linzey sat in the back seat. Lieutenant Tarlecky advised appellant of his *Miranda* rights and asked whether appellant wanted to talk to him. Appellant said, "'No.'" Lieutenant Tarlecky then asked appellant his age and whether he was on probation. Major Linzey informed appellant that he was going to be arrested and booked for homicide. He also told appellant, "[I]f at any point during that [process] you want to tell us what happened[,] please feel free to do so." Major Linzey testified that appellant responded, "'What happened?'" When Major Linzey told him, "'Uh-huh,'" appellant proceeded to tell them "exactly what happened there at the residence." Major Linzey said that they asked appellant follow-up questions.

Major Linzey testified that appellant told them that he had gone to the victim's residence to steal the victim's guns. He learned about the guns from a friend. He took some Xanax that night and drove to the residence with a shotgun. He went inside, and the victim confronted him. The victim shot at him, and appellant returned fire. When he exited the house, he was disoriented, and it took him some time to find his vehicle again. Major Linzey testified that appellant never asked for an attorney, and he was "very cooperative and talked openly." He did not appear to be impaired, but Major Linzey asked appellant whether he was under the influence of anything. Appellant told him that he had taken three to four "bars" of Xanax.

After appellant's statement, Major Linzey had Sergeant Pickard transport appellant to the jail[4] and then to the hospital to have blood drawn. Major Linzey stayed at the crime scene until 11:15 a.m. He said that he received a telephone call at 10:39 a.m. from Sheriff Barker informing him that appellant's parents were at the sheriff's office.

---

[4] During cross-examination, Major Linzey testified that appellant left the scene at 6:42 a.m. with Sergeant Pickard.

Major Linzey said that around 1:00 p.m., he escorted appellant to a conference room at the sheriff's office so that he could talk to his parents. Major Linzey explained that in the interim, Lieutenant Tarlecky and Detective Lisa House had been conducting "an in-depth interview" with appellant. Major Linzey and Sheriff Barker stayed in the room while appellant and his parents spoke. The conversation was not recorded, but Major Linzey recalled that appellant told his parents what had occurred at the victim's residence.

On cross-examination, Major Linzey testified that Lieutenant Tarlecky wrote "Refused" on an Admonition and Waiver form after appellant indicated that he did not want to talk to them. He further testified as to the reasons he arrested appellant for homicide. He explained that the shotgun shells found in the house were consistent with the shotgun found in appellant's possession, that appellant's vehicle was parked so that it was hidden from the house, and that appellant was wearing a full-face ski mask and a glove.

Sumner County Lieutenant Christopher Tarlecky testified that he spoke with James Isenberg at the crime scene on October 30, 2009. Mr. Isenberg, who lived on the second floor of the residence, told him that he had been awakened by gunshots. Mr. Isenberg also told him that the victim had disagreements with the "Bush Hog operator" and a nephew.

After interviewing Mr. Isenberg, Lieutenant Tarlecky spoke with appellant. As he escorted appellant from Deputy Magee's vehicle to his own, he asked appellant whether he was injured, whether he was called Tyler or James, and whether "he was on anything." Appellant responded that he was not injured and that he had taken Xanax. Lieutenant Tarlecky said that appellant was wearing blue jeans, a black hooded jacket, and a "ski mask type cap."

Once he had placed appellant in the front seat of his vehicle, Lieutenant Tarlecky read the *Miranda* warnings to him, and he also had appellant read a paragraph from the form. Lieutenant Tarlecky asked appellant whether he wanted to talk, and appellant responded, "'No.'" Lieutenant Tarlecky then asked appellant if he was eighteen, whether he had ever been arrested before, and if he was on probation. Appellant answered affirmatively to all three questions. Lieutenant Tarlecky said that the purpose of the questions was to determine whether appellant would be going to the jail or to juvenile detention and to facilitate the booking process. Lieutenant Tarlecky testified that Major Linzey advised appellant that he was being placed under arrest for homicide and that he could tell the officers what happened at any point during the investigation if he wanted. Appellant proceeded to tell them what happened, and they asked him questions.

After appellant had been transported away from the scene, Lieutenant Tarlecky helped process the crime scene. He said that he was present when the shotgun was removed from

appellant's vehicle. Later, he and Detective House went to the sheriff's office to interview appellant. Lieutenant Tarlecky testified that at 11:10 a.m., appellant signed a *Miranda* rights Admonition and Waiver form. During the interview, they took several breaks to allow appellant to smoke and to eat lunch.

Lieutenant Tarlecky agreed that the main point of the 11:10 a.m. interview was to ascertain whether anyone had helped appellant commit the crime or "put him up to it." During the interview, Lieutenant Tarlecky obtained appellant's consent to search his cellular telephone, and Detective House obtained appellant's consent to search his bedroom. After the interview concluded, Major Linzey took appellant to meet his parents.

On cross-examination, Lieutenant Tarlecky clarified that he wrote "Refused" on the waiver form because appellant refused to talk to them at first, not because he refused to sign. The lieutenant said that he did not give appellant an opportunity to sign or to refuse to sign the waiver form.

Detective Lisa House testified that during the course of the 11:10 a.m. interview with appellant, appellant told her that he had gotten ammunition from his residence. She asked him for permission to search the residence, and he gave his consent by signing a form. He also told her that the ammunition was located in a dresser drawer in his bedroom. Detective House testified that she told him she would also get consent to search the residence from appellant's parents because it was their house.

The trial court ruled that Deputy Magee's seizure of appellant was supported by reasonable suspicion, and his continued detention was supported by probable cause. Concerning appellant's various statements, the trial court suppressed appellant's 6:03 a.m. statement to Lieutenant Tarleckey and Major Linzey, reasoning that the officers did not "scrupulously honor [appellant's] right to cut-off questioning." However, the court ruled that appellant's statements to Deputy Magee and to Sergeant Pickard were admissible as they were not the result of custodial interrogation. Furthermore, the trial court ruled that appellant's 11:10 a.m. statement, his 1:00 p.m. statement to his parents, and his 8:39 p.m. statement to Detective Forrest[5] were admissible.

## B. Trial

Mary Lou Lassiter, the victim's sister, testified that the victim was sixty-one years old when he died. He had lived at his farm, Elephant Walk, since 1988. She said that his house

---

[5] No testimony was presented at the motion hearing regarding the 8:39 p.m. statement; however, a recording of the statement was admitted into evidence at the suppression hearing.

was approximately 3,500 square feet in size, and the driveway to the house was three-quarters to one mile long. She further said that a rock wall encircled the house.

Ms. Lassiter testified that James Isenberg had been married to Olivia Lassiter, the sister of Ms. Lassiter and the victim, for a time. However, Mr. Isenberg was also friends with the victim and had lived with the victim for three years prior to the victim's death. Mr. Isenberg had passed away prior to the trial.

On cross-examination, Ms. Lassiter testified that she never heard the victim mention appellant's name. She agreed that the victim had been friends with Mark Griffin and that Mr. Griffin's son, Matthew, had visited Elephant Walk.

James Isenberg, via deposition, testified that he had lived at the victim's house for approximately three years prior to the victim's death. On the night of October 29, 2009, Mr. Isenberg said that he and the victim watched a football game. Mr. Isenberg then he went to the upstairs den where he fell asleep on the couch while watching television. He was awakened by gun shots. Mr. Isenberg testified that he heard two shotgun blasts, followed by the victim saying, "'You son of a b****.'" He heard three pistol shots after the victim's exclamation. Mr. Isenberg went halfway down the stairs to investigate. He saw the victim lying on the floor and heard the victim moaning. While he watched, the victim stopped moaning. Mr. Isenberg assumed that he died at that point. Mr. Isenberg called 9-1-1.

Mr. Isenberg testified that the victim had six to seven rifles and shotguns in a gun rack in the downstairs den. The victim also had a pistol that Mr. Isenberg assumed was kept in the victim's bedroom. Mr. Isenberg testified that none of the victim's guns were missing after his death. He further testified that the victim owned several dogs, one of which he occasionally brought inside. Mr. Isenberg did not recall seeing or hearing a dog the night of the victim's death. He said that he had never seen appellant prior to seeing him during the deposition.

On cross-examination, Mr. Isenberg testified that the victim had included Mark Griffin in his will but that Mark Griffin passed away before the victim died. Mr. Isenberg recalled that the victim became angry with Matthew Griffin for "bad mouthing" his father.

Sergeant Aaron Pickard testified that he was dispatched to the victim's residence at 4:26 a.m. He arrived at 4:35 a.m. and was the first officer at the scene. Sergeant Pickard saw a blue Cadillac in the driveway but did not see anyone inside. He ordered other responding officers to investigate the Cadillac when they arrived. When Sergeant Pickard approached the house, he saw Mr. Isenberg, through a glass storm door, standing on the staircase. Upon

entering the house, he smelled gun powder. He found three shotgun shells on the floor, two of which were spent, and he saw a nine millimeter pistol beside the victim's body.

Deputy Christopher Magee testified that when he arrived at the victim's residence, he stopped at the Cadillac and directed all of the lights on his vehicle toward it. He saw movement inside and approached with his weapon drawn. He observed that appellant was lying in between the front seat and floorboard, clutching a "dark colored long gun." Deputy Magee directed appellant to drop the weapon and exit the vehicle. When appellant complied, Deputy Magee handcuffed him and searched him. He asked him whether anyone was with him, and appellant responded, "'No.'" He collected appellant's wallet and cellular telephone from appellant's pockets and placed appellant in the back of his patrol car. Deputy Magee testified that appellant asked him several times whether he could call his parents and told him, "I didn't mean to shoot that guy[,] but I didn't want to get shot."

While appellant was sitting in Deputy Magee's vehicle, officers were examining the crime scene and collecting evidence. Captain Don Badacour testified that from the house, he collected three shotgun shells, two of which were spent; three bullet casings, two of which were found in a room behind the victim's body and one of which was underneath his body; and the nine millimeter pistol. He further testified that there were three bullet holes in the house: one went through a front window after ricocheting off a door; one entered the wall by the front windows; and one entered the baseboard under the front windows. Captain Badacour also collected a twelve-gauge shotgun and packaging for a pair of gloves from inside the Cadillac, as well as a gun case from the Cadillac's trunk. On cross-examination, Captain Badacour testified that he dusted for fingerprints in the vehicle and in the house, but he was not aware of the results of the fingerprint analysis.

Lieutenant Christopher Tarlecky testified that he arrived at the crime scene at 5:15 a.m. He interviewed Mr. Isenberg and videotaped the crime scene. He spoke with appellant, but appellant invoked his right to remain silent. Lieutenant Tarlecky performed a gunshot residue test on appellant's hands at the scene.

Lieutenant Tarlecky would later interview appellant at the Criminal Investigation Division's office, but before that interview, Sergeant Pickard transported appellant to the jail[6] and then to the hospital to have his blood drawn for a toxicology analysis. Sergeant Pickard testified that when he and appellant were leaving the victim's farm, they saw news vans parked at the end of the driveway. Appellant asked him "if his name was going to be on the news." Sergeant Pickard responded that "no one knew him by his name or what had went

---

[6] While not included in the trial transcript, we note that the testimony from the motion to suppress hearing indicated that Sergeant Pickard left the scene with appellant at 6:42 a.m.

[sic] on at [that] point." Sergeant Pickard testified that appellant then said "'I didn't want to kill that guy.'" The recording of their interaction revealed the following exchange:

> Appellant:  Is that a news van?
>
> Pickard:  Looks like.
>
> Appellant:  Is it on the news this morning?
>
> Pickard:  I don't know. I haven't had time to watch.
>
> Appellant:  If it is, are they going to say my name over the news?
>
> Sergeant:  Nobody knows anything at this point.
>
> Appellant:  You know, I didn't mean to kill that guy.
>
> Sergeant:  As far as I know.

When they arrived at the jail, Detective Wes Martin obtained appellant's consent to have his blood drawn, and Sergeant Pickard transported him to the hospital for that to be done.

Just after 11:00 a.m., Lieutenant Tarlecky and Detective Lisa House interviewed appellant at the sheriff's office. They advised appellant of his *Miranda* rights, and he signed the Admonition and Waiver form. Subsequently, they interviewed appellant, and the jury was shown a video recording of the interview. During the interview, appellant described the events of October 29 and 30. He did not work on October 29, so he spent time with friends, particularly Matthew Griffin. Appellant told the officers that Matthew Griffin's father had been friends with the victim. At some point prior to October 29, Matthew Griffin told appellant about the guns at the victim's house and showed him where the victim lived.

Appellant said in his statement that he "ate" several Xanax pills throughout the day and smoked marijuana. He went to the mall, to a high school football game, and to a friend's apartment. He and Matthew Griffin went "muddin[g]" in Matthew's truck. At some point, appellant concocted a plan to go to the victim's house to take his guns. He said that he would have tried to sell the guns because he needed money to pay for a loan and car insurance. Appellant said that he tried to get friends to go with him to the victim's house, but the people he asked were either unavailable or were unwilling to go. After parting from Matthew Griffin, appellant said that he went home for a short time. He left his house with his loaded shotgun in its case and drove his parents' car to Walmart, where he bought gloves and a ski

mask. He said that he wanted to disguise himself in case he saw anyone at the victim's house. Appellant said that the shotgun was for his own protection. Appellant drove to the victim's house and walked inside through an unlocked door. He found the gun rack almost immediately but wanted to walk through the house to see if anyone was awake. Appellant said he walked through the kitchen and "back around." When he did that, he saw the victim. Appellant said,

> I was trying to make my way to the door[,] and I seen [sic] him holding a pistol. . . . I believe I was standing right beside the door[,] and then he come [sic] around the corner with a pistol. And I think he fired two shots[,] and it [sic] went to my right – to right of me[,] and that's when I shot. And when I shot, I didn't even aim it at him.

Appellant recalled pumping the shotgun but only remembered firing once. He said that he had three shells in the gun and believed the shells were birdshot. Appellant said that when he saw the victim fall, he left the house. He did not know "which way [he came] out," and he could not immediately find his vehicle. Appellant recalled hearing people in the front yard. When he found his car, he "sat there until everybody pulled up."

Appellant gave his permission for the police to search his cellular telephone, and he also gave permission to search his bedroom at his parents' house. He told Detective House where he kept his remaining ammunition. Lieutenant Tarlecky said that he found a text message conversation on appellant's telephone wherein appellant asked Matthew Griffin, "Last drive on right?" The lieutenant said that the message was sent at 3:59 a.m. but not delivered until later that day. Detective House testified that she found the ammunition exactly where appellant had told her it would be.

Dr. Feng Li, Senior Associate Medical Examiner, testified that the victim died from two shotgun wounds to the left side of his body, both of which were "potentially fatal." One wound perforated the victim's left subclavian artery, and the second caused rib fractures and a contusion of the left lung. Dr. Li opined that the muzzle of the shotgun was five to seven feet from the victim.

Several Tennessee Bureau of Investigation ("TBI") agents testified regarding the forensic analysis associated with this case, all of whom were accepted by the trial court as experts in their respective fields. Special Agent John Harrison testified that appellant's blood was negative for alcohol. Special Agent Dawn Swiney testified that appellant's blood was positive for the family of drugs called benzodiazepines and for marijuana metabolite. She further testified that she performed a basic drug screen on appellant's blood, which included screening for Alprazolam, also known as Xanax, and that the screening was negative for

Alprazolam. She explained that it would take eighteen to sixty hours for the amount of Alprazolam in the body to become too low to register in the screening.

Special Agent Jennings Russell Davis, II, testified that he analyzed the gun shot residue kits taken in this case. The results for the victim's hands were inconclusive, and the results for the appellant's hands were negative for gun shot residue. Agent Davis also tested the clothing collected from appellant. He found gun shot residue on the right sleeve of appellant's hooded jacket and on the ski mask. No gun shot residue was found on the remaining articles of clothing.

Special Agent Alex Brodhag testified that he examined both firearms associated with this case. He stated that the nine millimeter pistol found at the scene fired the bullet casings also found at the scene. Agent Brodhag further stated that the shotgun found in appellant's possession fired the two spent shells found at the scene. The shells found at the scene were manufactured by Kent and were twelve gauge, number eight birdshot. Agent Brodhag testified that the ammunition found at appellant's home was consistent with that found at the scene. He further testified that the shotgun pellets removed from the victim's body were number eight birdshot.

Matthew Griffin and Holly Haskins testified on behalf of appellant. Matthew Griffin testified that the victim was "like a second father to [him]" and that appellant was his best friend. He had a "misunderstanding" with the victim that led him to call the drug task force to make a report against the victim two days before the victim's death. Matthew Griffin testified that he spent the day with appellant on October 29. He said that appellant might have had some liquor, and he recalled that appellant bought Xanax. He did not personally see appellant take the Xanax, but he said that appellant slept through much of their "four-wheeling" trip. Matthew Griffin attributed appellant's sleepiness to the effects of Xanax. He said that he never took appellant to Elephant Walk. On cross-examination, Matthew Griffin said that he had not been mad enough at the victim to kill him.

Holly Haskins testified that she overheard a conversation between appellant and Matthew Griffin about the two of them going somewhere. She recalled that appellant seemed reluctant to go. She did not remember the destination they discussed, and she did not remember telling law enforcement that they mentioned the name "Lassiter."

Following the close of proof and deliberations, appellant was convicted as charged. The trial court sentenced him to life in prison for the felony murder conviction and to six years each for the other two convictions. The trial court ordered that all sentences be served consecutively.

## II. Analysis

### A. Motion to Suppress

Appellant made several statements to law enforcement officers throughout the day of October 30, 2009. The trial court suppressed the statement made at 6:03 a.m. On appeal, he argues that the trial court erred by denying his motion to suppress the other statements and physical evidence obtained as a result of the statements. In particular, he argues that the trial court should have suppressed his statements to Deputy Magee as the product of an unwarned custodial interrogation, its functional equivalent, or an unlawful detention. Furthermore, he argues that the trial court erred by admitting statements made after the suppressed 6:03 a.m. statement because, he contends, these statements were tainted by the violation of appellant's right to remain silent during the 6:03 a.m. interview. Those statements include his statement to Sergeant Pickard while en route to the jail at 6:42 a.m., the 11:10 a.m. statement to Lieutenant Tarlecky and Detective House, statements made during his 1:00 p.m. meeting with his parents, and his 8:39 p.m. statement to Detective Forrest. The State responds that appellant's constitutional rights were not violated at any point, including during the 6:03 a.m. interview that was suppressed by the trial court. After careful review, we conclude that the trial court's rulings on the motion to suppress were correct. However, we note that appellant's statements to his parents at 1:00 p.m. and to Detective Forrest at 8:39 p.m. were not admitted into evidence at trial; therefore, we will not consider appellant's arguments regarding those statements in this opinion.

### 1. Standard of Review

A trial court's determination of issues at a suppression hearing is presumptively correct on appeal. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994) (citing *State v. Harbison*, 704 S.W.2d 314, 318 (Tenn. 1986)), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). We review de novo the trial court's legal conclusions denying a motion to suppress. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008) (citations omitted). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate

inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

The central focus of appellant's arguments regarding his motion to suppress is the federal and state constitutional protections against compelled self-incrimination. "The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" *Id.* (quoting Tenn. Const. art. I, § 9).

Due to "the inherently compelling pressures of in-custody interrogation," the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), "limited the admissibility of statements that would ordinarily meet the due process test of voluntariness" by establishing prophylactic rules designed "to permit a full opportunity to exercise the privilege against self-incrimination." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992)). Any statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" must be excluded "unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. These procedural safeguards require an officer to advise an accused prior to custodial interrogation or its functional equivalent

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479; *see also Rhode Island v. Innis*, 446 U.S. 291, 298 (1980); *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005).

Notwithstanding, an accused may waive his right against self-incrimination. *Thacker*, 164 S.W.3d at 248 (citing *Miranda*, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under *Miranda* must be made intelligently, knowingly, and voluntarily to be held constitutional. *Id.* (citing *Miranda*, 384 U.S. at 444).

> The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper *Miranda* warnings have been issued. Statements and

-14-

confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary.

*Id.* (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. *Id.* at 249 (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)).

### 2. Statements Made to Deputy Magee

Appellant's first argument challenges the admission of statements he made to Deputy Magee during his detention by the deputy. Deputy Magee was the first officer to come into contact with appellant on October 30. Deputy Magee was responding to a shots fired call on a remote farm and did not know that there was only one deceased victim inside the residence. He came upon appellant, who was clearly attempting to hide in a vehicle that had already been determined to be suspicious. Not only was appellant hiding, he was holding a shotgun. Deputy Magee would not have known how many suspects might be in the area, whether appellant was a victim himself, or whether appellant's shotgun was loaded. In other words, Deputy Magee's interaction with appellant began under tense circumstances. Deputy Magee instructed appellant to drop the weapon and exit the vehicle. When appellant exited, Deputy Magee asked him what he was doing there and whether anyone was with him. Appellant answered, "I shouldn't have been here," and "No," respectively. Almost simultaneously, Deputy Magee handcuffed appellant and searched him for weapons. He also collected appellant's wallet, cellular telephone, and a glove. The deputy testified that he believed that appellant was under the influence of some substance based on his slow movements, his sweating, and his slurred speech. Deputy Magee placed appellant in the back seat of his patrol car and lowered the window several inches. Deputy Magee did not stay inside the patrol car himself the entire time but entered and exited occasionally. Over the course of the next eight to nine minutes, appellant asked Deputy Magee several times whether he could call his father. Deputy Magee told him to "hang tight." They had another exchange wherein appellant asked for the time, and Deputy Magee asked him, "Why?" When appellant told him that the vehicle belonged to his mother, Deputy Magee said, "And?" While another officer gave directions over the radio to law enforcement personnel, the following exchange occurred:

-15-

| | |
|---|---|
| Appellant: | Is he going to be ok? |
| Deputy Magee: | I don't know |
| Appellant: | I didn't mean to shoot that man, but I thought I was going to get shot myself. |

At that point, Deputy Magee essentially told him not to say anything else.

On appeal, appellant argues that Deputy Magee subjected him to an unwarned custodial interrogation or its functional equivalent. It is unquestioned that appellant was in custody and that Deputy Magee did not give the *Miranda* warnings to appellant. Therefore, the only issue that remains is whether Deputy Magee's words and actions constituted an interrogation, its functional equivalent, or questioning that falls under an exception to *Miranda*. The United States Supreme Court in *Rhode Island v. Innis* provided the following guidance for lower courts:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police *(other than those normally attendant to arrest and custody)* that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known were reasonably likely to elicit an incriminating response.*

*Innis*, 446 U.S. at 301-02 (1980) (emphasis added) (footnote call numbers omitted); *see also Sawyer*, 156 S.W.3d at 533. We note that appellant never testified as to his perception of Deputy Magee's words, but Deputy Magee testified that he never intended to interrogate appellant.

The first words by Deputy Magee to which appellant takes exception – "Why are you here?" and "Are you alone?" – are properly categorized as questions asked by an officer

during the seizure of an armed person found near the scene of a shooting. Arguably, these are words and actions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. These were certainly questions asked for the purpose of ensuring the safety of Deputy Magee and other officers. "An officer may ask questions that are necessary to ensure the officer's safety or that of the public without violating the *Miranda* rights of a person in custody." *State v. Dyron Norm Yokley*, E2009-02646-CCA-R3CD, 2011 WL 2120096, at *23 (Tenn. Crim. App. May 20, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011) (citing *New York v. Quarles*, 467 U.S. 649, 657 (1984)). In *New York v. Quarles*, police officers asked a handcuffed suspect where his gun was because they believed he had dropped it in a supermarket, where an accomplice, customer, or employee might find it. *Quarles*, 467 U.S. at 657. The United States Supreme Court ruled that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* In this case, Deputy Magee had just encountered an armed man hiding in a vehicle at a residence where shots had been fired. We conclude that his questions to appellant were appropriate under the circumstances.

Appellant also argues that Deputy Magee's actions in activating a recording device while appellant was handcuffed in the backseat of his patrol car and Deputy Magee's words in conversing with appellant were calculated to elicit an incriminating response. The record reflects that appellant asked Deputy Magee about the time and whether he could call his father. Deputy Magee was vague about when or if appellant would be allowed to call his parents, and when appellant asked for the time, Deputy Magee responded with a question. Soon thereafter, and within nine minutes of being placed in the patrol car, appellant asked, "Is he going to be ok?" and Deputy Magee responded, "I don't know." Then, appellant confessed to shooting the victim.

We conclude that the words, "I don't know," were not reasonably likely to elicit an incriminating response. The interaction between Deputy Magee and appellant was very similar to the situation in *Yokely*, in which a police officer placed a recorder in his patrol car while a suspect was sitting in the backseat. *Yokely*, 2011 WL 2120096, at *23. They occasionally conversed, and the officer asked a question about the suspect's injuries. *Id.* This court concluded that the officer's "questions and actions were not 'reasonably likely to elicit an incriminating response.'" *Id.* (quoting *Innis*, 446 U.S. at 301). Likewise, in this case, neither Deputy Magee's words nor actions leading up to appellant's confession were reasonably likely to elicit an incriminating response under the circumstances. Therefore, because the deputy was not interrogating appellant nor practicing its functional equivalent, appellant was volunteering information when he confessed to shooting the victim. "Volunteered statements of any kind are not barred by the Fifth Amendment[,] and their admissibility is not affected" by the holding of *Miranda*. *Miranda*, 384 U.S. at 478. *See also State v. Hurley*, 876 S.W.2d 57, 66 (Tenn. 1993); *State v. Ensley*, 956 S.W.2d 502, 511

(Tenn. Crim. App. 1996); *State v. Ezra Shawn Ervin and Andrew McKinney*, E1999-00287-CCA-R3-CD, 2001 WL 15832, at *3 (Tenn. Ct. App. Jan. 9, 2001).

For his final argument regarding his statements to Deputy Magee, appellant contends that those statements were the product of an unlawful detention. In his brief, appellant concedes that Deputy Magee had reasonable suspicion to detain him but argues that his detention "went beyond the scope of an investigatory detention." The State responds that Deputy Magee had probable cause to support a full-scale arrest of appellant, which would render his detention proper. We agree with the State.

Beginning with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and [that] any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our supreme court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). "'While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not.'" *Id.* (quoting *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006)).

An arrest supported by probable cause is an exception to the warrant requirement. *Id.* (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009)); *see Brown v. Illinois*, 422 U.S. 590, 598 (1975). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 SW.3d at 277-78 (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, 382 S.W.3d at 278 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id.* (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted).

In this case, when Deputy Magee initially detained appellant, the deputy knew that shots had been fired at the residence and that appellant had been hiding in a car while holding

a firearm. As appellant conceded, the deputy certainly had reasonable suspicion to detain him. However, prior to or simultaneously with the detention, Sergeant Pickard was inside the residence. The sergeant found a deceased victim and spent shotgun shells. Furthermore, Deputy Magee testified at the suppression hearing that he knew there was at least a wounded victim inside the house before he initially encountered appellant and that he had learned the victim was deceased after placing appellant in his patrol car. The radio chatter recorded during Deputy Magee's encounter with appellant further evinces that the officers in the house were in communication with the officers outside. We conclude that the combined knowledge of Sergeant Pickard and Deputy Magee was "'sufficient to warrant a prudent [person] in believing that the [appellant] had committed . . . an offense.'" *Echols*, 382 SW.3d at 277-78. As appellant's statements to Deputy Magee were volunteered during a lawful detention, the trial court properly admitted them.

### 3. 6:03 a.m. Interview

The State contends that the trial court erred by granting appellant's motion to suppress the statement appellant gave to Lieutenant Tarlecky and Major Linzey at approximately 6:03 a.m. The trial court reasoned that the officers did not "scrupulously honor" appellant's right to remain silent. We conclude that the trial court appropriately suppressed this statement.

The record reflects that Lieutenant Tarlecky read the *Miranda* warnings to appellant and had him read the paragraph pertaining to waiver. Lieutenant Tarlecky asked appellant whether he wanted to talk to the officers, and he responded, "'No.'" Lieutenant Tarlecky wrote, "Refused," on the waiver form. After several seconds of silence, Lieutenant Tarlecky asked appellant (1) to confirm his age, (2) whether he had ever been arrested before, and (3) whether he was on probation. Appellant responded that he was eighteen, that he had previously been arrested, and that he was on probation. Then, Major Linzey told appellant that he was going to be taken to jail and charged with murder. Major Linzey also told appellant to let the officers know if he changed his mind about talking to them about "what happened." Appellant asks, "What happened?" After Major Linzey said, "Uh-huh," appellant proceeded to tell the officers that he had gone into the victim's house, that the victim had shot at him, and that he returned fire. At that point, the officers began asking questions, which had the effect of obtaining more information from appellant.

In *Michigan v. Mosley*, the United States Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley*, 423 U.S. 96, 104 (1975). Of course, an accused can change his mind about giving a statement after he has invoked his Fifth Amendment rights. In such a situation, the record must show that the accused validly waived his rights:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981).

The trial court ruled that the first questions by Lieutenant Tarlecky regarding appellant's age and probation status were permissible, and we agree.[7] Furthermore, we conclude that Major Linzey's informing appellant that he was being charged with homicide was permissible because, under the facts and circumstances of this case, it does not appear that he intended to elicit incriminating information by so doing. *Cf. State v. Sawyer*, 156 S.W.3d 531, 534-35 (Tenn. 2005) (reading affidavit of complaint to accused prior to giving *Miranda* warnings was functional equivalent of custodial interrogation). However, the officers never sought to ensure that appellant wanted to waive his right to remain silent after he began to talk and before they began questioning him. In *State v. Walton*, our supreme court ruled that the police must give *Miranda* warnings after a suspect makes a voluntary statement and before asking follow-up questions. 41 S.W.3d 75, 85 (Tenn. 2001).[8] The court reasoned that following this procedure ensures that the answers to the follow-up questions "are truly voluntary and free from 'relevant defendant ignorance.'" *Id.* (quoting *State v. Callahan*, 979 S.W.2d 577, 582 (1998)). Because the officers did not follow this procedure, we cannot say that appellant's answers to their questioning were given voluntarily. Therefore, we affirm the trial court's suppression of appellant's 6:03 a.m. statement.

---

[7] Courts have allowed some express questioning when "(1) the questions do not infringe upon 'the underpinnings of Miranda,' or (2) those underpinnings are outweighed by other concerns," such as routine booking questions and questions that elicit non-testimonial information. *State v. Walton*, 41 S.W.3d 75, 84 (Tenn. 2001) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 591-602 (1990))

[8] The situation in *Walton* differed slight from the case *sub judice* in that the suspect's voluntary statement occurred prior to the police informing him of his *Miranda* rights, whereas in this case, appellant had been informed and had invoked the right to remain silent. *Walton*, 41 S.W.3d at 85. However, in its ruling, the court applied reasoning from cases where the situation mirrored this case. *Id.*

4. Subsequent Statements

Appellant argues that all of his statements made after the 6:03 a.m. confession were tainted by the illegal extraction of that confession. The Tennessee Supreme Court has held that there is a rebuttable presumption that the "'extraction of an illegal, unwarned confession'" taints any subsequent confession and that the State may overcome the presumption by establishing "'that the taint is so attenuated as to justify admission of the subsequent confession.'" *State v. Dailey*, 273 S.W.3d 94, 110 (Tenn. 2009) (quoting *State v. Smith*, 834 S.W.2d 915 (Tenn. 1992)). In *Smith*, the supreme court set forth nine factors to "consider when examining the totality of the circumstances surrounding the [initial and subsequent confessions] in order to determine whether the [subsequent] confession[s] 'can truly be termed . . . knowing and voluntary statement[s].'" *Dailey*, 273 S.W.3d at 110 (quoting *Smith*, 834 S.W.2d at 920). The *Dailey* court summarized those nine factors as follows:

1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confessions;

3. The reading and explanation of *Miranda* rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

*Id.* at 111-12 (citing *Smith*, 834 S.W.2d at 919-20).

Under these factors, we must first analyze further the 6:03 a.m. confession and the circumstances that surrounded it. Appellant had indicated prior to 6:03 a.m. that he was willing to talk by spontaneously confessing to Deputy Magee that he had shot the victim. The officers read the *Miranda* warnings to appellant, and he invoked his right to remain silent. As previously discussed, the reason that the "extraction" of the confession has been deemed illegal was because the officers failed to obtain appellant's waiver of his *Miranda* rights. Having reviewed the recording of the 6:03 a.m. interview, we cannot say that there were any coercive tactics used by the officers. They only began questioning appellant after he told them that he had gone inside the house, that the victim had shot at him, and that he had returned fire.

The 6:03 a.m. confession was obtained approximately one and one-half hours after the sheriff's deputies arrived at the crime scene and found appellant. During that one and one-half hours, appellant was in custody but was not interrogated or subjected to its functional equivalent. Appellant stated that he had taken Xanax the day before the offense, but this confession would have been many hours after appellant ingested whatever benzodiazepine he actually took.[9] Appellant was only eighteen; however, there has been no indication that he was of below-average intelligence, and he had some experience with the law as he had a prior conviction. Keeping all of these circumstances in mind, we will now analyze each statement that appellant insists should have been suppressed.

### a. 6:42 a.m. Statement to Sergeant Pickard[10]

Appellant argues that his statement to Sergeant Pickard while they were leaving the crime scene – "I didn't want to kill that guy" – "was causally connected both temporally and

---

[9] As the TBI agent testified at trial, no Xanax was found in appellant's system, but his blood tested positive for the family of benzodiazepine drugs.

[10] Because the record does not indicate the exact time of this statement, we will refer to it by the time that Sergeant Pickard and appellant left the crime scene to differentiate it from the other statements given throughout the day.

substantively to the illegal interrogation." While we acknowledge that the statement was made very soon after the 6:03 a.m. confession, the recording of the event reveals that appellant was not subjected to interrogation or its functional equivalent. This statement was volunteered, and as previously discussed in this opinion, volunteered statements are not within the purview of *Miranda*. *See Miranda*, 384 U.S. at 478. Therefore, the trial court properly denied appellant's motion to suppress this statement.

### b. 11:10 a.m. Statement

Next, appellant contends that the 11:10 a.m. statement should have been suppressed because, he argues, the *Miranda* waiver was ineffective and the *Dailey/Smith* factors weigh against its admission. The record shows that approximately five hours passed between the suppressed statement and the 11:10 a.m. statement. During that time, appellant had been given cigarettes, but he was not given food until part of the way through the 11:10 a.m. interview. Also during those hours, he was taken to the hospital to have his blood drawn. One of the same officers from the previous interview was present for the 11:10 a.m. interview. When presenting the *Miranda* admonition and waiver form, Lieutenant Tarlecky characterized it as being the same information he was given earlier. Appellant signed the form and then read aloud the paragraph stating that he was waiving his rights.

We have already concluded that there were no coercive tactics used to obtain the first confession, and the record shows that there were no coercive tactics used in the intervening time. As the State said during oral arguments, this was not a "dim lights and rubber hose" situation. In other words, the original "taint" was minimal. Furthermore, the circumstances of the 11:10 a.m. confession, isolated from any impact of the suppressed confession, present no cause for concern. Appellant has focused on the psychological effect of having previously confessed and the effectiveness of the 11:10 a.m. *Miranda* waiver. As for the psychological effect, appellant ignores the fact that he also confessed spontaneously to Sergeant Pickard and Deputy Magee. Thus, we cannot say that the psychological effect factor has any bearing on the 11:10 a.m. confession.

Appellant argues that the *Miranda* waiver was ineffective because officers earlier ignored his right to cut off questioning. We note that the officers did, in fact, honor appellant's right to remain silent until he himself volunteered that he had shot the victim. A determination that their subsequent questions were a failure to scrupulously honor appellant's right to remain silent does not automatically mean that a subsequent waiver obtained several hours later is invalid. The accused's waiver of his right against self-incrimination under *Miranda* must be made intelligently, knowingly, and voluntarily to be held constitutional. *Thacker*, 164 S.W.3d at 248. Appellant expressly waived his *Miranda* rights prior to the

11:10 a.m. interview, and the record shows that there was no coercion involved. Therefore, we conclude that his 11:10 a.m. waiver was effective.

The circumstances of this case are not very different from that in *Smith*. The supreme court, in ruling that Smith's subsequent confession was given knowingly and voluntarily; stated that three hours had passed since the first confession; no coercive tactics were used to obtain either confession; the location and interrogators changed; he was not prevented from speaking with counsel or family; he was advised of his *Miranda* rights; there was no indication that he did not understand those rights; and he signed a written waiver of those rights. *Smith*, 834 S.W.2d at 920. The court further stated,

> The only coercive influence apparent in this record is the fact that Smith was in police custody at the time of his statement and at all relevant times after his arrest. Although police custody is inherently coercive and compelling, if we were to hold this single factor sufficient to vitiate the voluntariness of a subsequent confession, an accused could never give a voluntary confession after arrest.

*Id*. The main differences between *Smith* and this case are that appellant was not allowed to meet with his parents until after the 11:10 a.m. interview and that one of the interrogators remained the same. Nonetheless, we conclude that application of the *Smith* factors to this case leads to the admissibility of the 11:10 a.m. statement. Taking the totality of the circumstances into consideration, we conclude that the "taint" of the 6:03 a.m. statement was sufficiently attenuated by the passage of time, lack of coercive tactics, lack of coercive atmosphere, appellant's spontaneously confessing to Sergeant Pickard, the re-administration of the *Miranda* warnings, and the subsequent waiver of the *Miranda* rights. As in *Smith*, the only coercive influence was that appellant was in custody, which is not "sufficient to vitiate the voluntariness of a subsequent confession." *Id.*

c. Physical Evidence

Appellant argues that certain physical evidence obtained in this case should have been suppressed under the "fruit of the poisonous tree" doctrine as products of an illegal detention and illegally obtained confessions. First, as we have already concluded that Deputy Magee's detention of appellant was legal, there is no basis for exclusion of the evidence found during the pat down search. Secondly, as the Tennessee Supreme Court stated in *Climer*, "[The 'fruit of the poisonous tree' doctrine has not been applied as a remedy for *Miranda* violations." *Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *United States v. Patane*, 542 U.S. 630, 642-43).

Nontestimonial evidence discovered as a result of a statement elicited in violation of *Miranda* must be suppressed "only when the statements are the product of an actual violation of the privilege against self-incrimination, i.e., such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not 'scrupulously honored.'"

*Id.* (quoting *Walton*, 41 S.W.3d at 92). Therefore, only evidence obtained as a result of the 6:03 a.m interrogation would have to be suppressed, but no physical evidence was obtained as a direct result of that interrogation. Therefore, appellant's argument in this regard is without merit.

## B. Sufficiency of the Evidence

Appellant argues that his confession to the aggravated burglary of the victim's residence was not corroborated by independent evidence and that without corroboration, the evidence was insufficient to support his conviction for aggravated burglary and thus for felony murder. He insists that the evidence only supports a conviction for second degree murder.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury

has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for aggravated burglary as charged in the indictment, the State must prove that appellant entered a habitation without the effective consent of the property owner and with the intent to commit theft. *See* Tenn. Code Ann. § 39-14-402, -403. Appellant contends that there was no evidence of aggravated burglary other than his uncorroborated confession. It is well-established in this state's case law that a conviction cannot be founded solely upon a defendant's confession, and our cases have long required some corroborating evidence in order to establish the corpus delicti." *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000). However, the threshold showing of corroborating evidence is very low. The Tennessee Supreme Court has ruled that

> [the corroborating] evidence is sufficient if . . . it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration. Thus when we have a verdict[,] even though founded on slight evidence of corroboration connecting the defendant with the crime, it cannot be said, as a matter of law, that the verdict is contrary to the evidence.

*Id.* (quoting *Ricketts v. State*, 241 S.W.2d 604, 606 (1951)).

In this case, there is substantial circumstantial evidence connecting appellant with the commission of the aggravated burglary, specifically the element that he did not have the effective consent of the property owner to enter the residence. He was found in the victim's driveway holding the shotgun that was proven to have killed the victim. The crime occurred extremely early in the morning, and appellant was wearing clothing that hid his features. Three witnesses testified that to their knowledge, appellant did not know the victim. The victim's roommate heard the victim call appellant a "son of a b****," suggesting that the victim did not invite the suspect inside. All of this is evidence that connects appellant to the commission of the aggravated burglary, thus corroborating appellant's confession that he entered the victim's house, uninvited, with the intent to take the victim's guns. Furthermore, this evidence, taken together with appellant's confession, is sufficient to support his

conviction for aggravated burglary. Therefore, his argument with regard to the aggravated burglary conviction is without merit.

Appellant further argues that he had abandoned his felonious intent by the time he killed the victim, thus negating an element of felony murder. To sustain appellant's conviction for felony murder, the State had to prove beyond a reasonable doubt that he killed the victim in the perpetration of a burglary. Appellant mistakenly relies on *State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999), for the proposition that if he no longer intended to commit a theft, then the felony murder rule should not apply. In *Buggs*, our supreme court addressed the issue of whether the felony murder rule applied when the intent to commit a felony did not occur until after the murder. *Buggs*, 995 S.W.2d at 107. The court stated that "in a felony[]murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Clearly, appellant's intent to commit the burglary existed prior to the shooting of the victim if he was, in fact, leaving the house when the victim emerged from his bedroom. Viewed in the light most favorable to the State, appellant entered the victim's house without his effective consent and with the intent to commit a burglary. The evidence is overwhelming that he shot and killed the victim inside the victim's house. Therefore, the evidence was sufficient to sustain his conviction for murder in the perpetration of a burglary.

## C. Jury Instructions

Appellant argues that the trial court erred by denying his requests for jury instructions on self-defense and voluntary intoxication. "The general principle in criminal cases is that there is a duty upon the trial judge to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand." *Id.*

### 1. Self-Defense

Appellant argues that there was sufficient evidence presented to give rise to an inference that he had abandoned his felonious intent when the victim began shooting at him

and was thereby justified in shooting the victim in self-defense. The Tennessee Code Annotated provides:

The threat or use of force against another is not justified:

. . . .

(2) If the person using force provoked the other individual's use or attempted use of unlawful force, unless:

(A) The person using force abandons the encounter or clearly communicates to the other the intent to do so; and

(B) The other person nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611. As in *Sims*, there is no question at this point in our analysis that appellant "provoked the use of lethal force in this case by burglarizing [the victim's] home." *Sims*, 45 S.W.3d at 9. In this case, viewed in a light most favorable to appellant, there is no evidence that he had abandoned his intent to burglarize the victim's house because the burglary was ongoing as long as appellant remained inside the house. Furthermore, appellant did not clearly communicate his intent to abandon the burglary because he returned fire instead of escaping when the victim began shooting at him. There is no proof to support self-defense because appellant was clearly inside the house when he shot the victim. Therefore, the trial court did not err by denying appellant's request for an instruction on self-defense.

2. Voluntary Intoxication

Although the intoxication of a defendant does not justify the crime, its existence may negate a finding of specific intent. *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn. 1976); *see* Tenn. Code Ann. § 39-11-503(a). "[W]hen a defendant is charged with an offense that requires a culpable mental state . . .'a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required.'" *State v. Henretta*, 325 S.W.3d 112, 130 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 815 n. 16 (Tenn. 2010)). The trial court denied appellant's request for an instruction on voluntary intoxication because the only evidence of intoxication was appellant's own statement. None of the sheriff's department officers who came into contact with appellant testified at trial that appellant was intoxicated,

although Lieutenant Tarlecky testified that he believed appellant's statement that he had taken Xanax and smoked marijuana the day before the shooting.[11]  Matthew Griffin testified that appellant was drowsy during a four-wheeling trip, which he attributed to appellant's having taken Xanax earlier.  He also testified that he did not personally see appellant take the Xanax.  No evidence was presented that the Xanax[12] impaired appellant's ability to form the culpable mental state.  Therefore, it was not error for the trial court to deny appellant's request for a voluntary intoxication jury instruction.  *See State v. Ronald Duckett*, No. W2010-02158-CCA-R3-CD, 2012 WL 1524373, at *4 (Tenn. Crim. App. April 30, 2012), *perm. app. denied* (Tenn. Sept. 19, 2012).

### D.  Prosecutorial Misconduct

Appellant claims that the State engaged in prosecutorial misconduct several times throughout its closing and rebuttal arguments.  Specifically, appellant argues that the State misled the jury, engaged in burden shifting, bolstered the credibility of State's witnesses, and misstated the law.

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument."  *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)).  Because closing argument is considered "an important tool for the parties during the trial process[,] . . . attorneys are usually given wide latitude in the scope of their arguments[.]"  *State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000).  However, "[a]rgument must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law."  *Id.* at 578 (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).  To constitute reversible error, statements made in closing argument must be improper, and if improper, the impropriety must have affected the verdict to the prejudice of the appellant.  *See Carruthers*, 35 S.W.3d at 578; *see also State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).  The Tennessee Supreme Court has recognized the following factors for courts to consider when making this determination:

---

[11]  Deputy Magee testified at the suppression hearing that appellant appeared to be under the influence of some substance, but he did not repeat this testimony at trial.

[12]  As previously stated, appellant's blood sample was negative for Xanax but was positive for benzodiazepines, the family of drugs that includes Xanax.  In other words, appellant may have taken something, but it was not Xanax.

1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case.

*Carruthers*, 35 S.W.3d at 578. Furthermore, this court has recognized the following five areas of prosecutorial misconduct in closing argument:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"[W]here a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute 'plain error.'" *State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005); *see* Tenn. R. App. P. 36. Our supreme court formally adopted this court's *Adkisson* test for reviewing claims of plain error:

The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before a court will find plain error. *Id.* at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

Appellant did not contemporaneously object to the comments he now complains of as being "false facts." He now contends that those comments constitute plain error. In his own closing argument, appellant stated that sometimes lay people tell law enforcement what they want to hear, and he pointed out that he invoked his right to silence at 6:03 a.m. and did "a complete 180" after being in custody for seven hours. In the State's rebuttal, the prosecutor reminded the jury about the defense's assertion in opening statements that appellant's will had been overborne by law enforcement. Then, the prosecutor made the following statements:

> He threw up the exhibit regarding the waiver at 6:00 where Mr. Reed refused to sign the waiver. Said he didn't want to talk to the law enforcement officers. Did you hear any questions whatsoever asked by law enforcement officers of Mr. Reed on the scene? You didn't. They didn't ask him anything. Then around 11:00 or 11:10 here at the Sheriff's Department[,] that's when the questions were asked because Mr. Reed at that time wanted to talk. Anybody has the right to change his or her mind.
>
> Is there any evidence in this record, in this case, that the Sheriff's Department did anything to put pressure on Tyler Reed? It's quite the contrary. They were very nice to him. Very polite to him all the way from the very beginning. No pressure. Mr. Reed obviously wanted to talk. . . . [I]n fact, the only question, I believe, the record shows that was asked of Mr. Reed out on the scene was by Chris Magee.

The defense did not object to these statements.

Appellant now argues that these comments constitute prosecutorial misconduct under a plain error review because the prosecutor knew that law enforcement officers had asked appellant questions at the scene during the interview suppressed by the trial court. Of course, the jury did not hear those questions, nor did it hear appellant's answers to those questions. Both parties were in a "catch-22" situation because appellant could not refer to the questions

asked during the suppressed interview to support his assertion to the jury that his will had been overborne, and the State could not refer to appellant's answers to those questions as evidence of his guilt. Both parties made arguments that probably should not have been stated. Therefore, in the context of this case, we cannot say that a plain error review of this issue is necessary to do substantial justice.

Next, appellant argues that the State improperly shifted the burden of proof onto the defense. During its rebuttal argument, the prosecutor called the defense a "smoke screen" and said that "if they try to make an allegation that somebody else has done something, they need to have evidence to present to you." Appellant objected. The trial court sustained the objection and gave a corrective instruction to the jury: "I will state that the burden of proof is on the State[,] and that never changes." Later, the prosecutor said, "The defense is based on innuendo, suggestion, and speculation. They want you to speculate Mr. Tyler Reed . . ." Again, appellant objected, the court sustained the objection, and the court gave a curative instruction. In light of the overall strength of the State's case and the trial court's issuance of proper curative instructions immediately after both complained-of statements, we cannot say that the statements affected the verdict to appellant's prejudice.

Appellant also argues that the State improperly bolstered the credibility of its witnesses when the prosecutor stated to the jury that they should be proud of the sheriff's department with regard to their quick response to the 9-1-1 call and the physical evidence collected. The prosecutor later stated, "I suggest to you that they have put together a good murder investigation." While not the most egregious example of witness bolstering, we agree with appellant that the prosecutor improperly bolstered the credibility of the sheriff's department; however, this case did not turn on the credibility of the officers due to the vast amount of physical evidence presented in this case. *See Goltz*, 111 S.W.3d at 6-7. Therefore, we conclude that these improper statements do not amount to reversible error.

Finally, appellant contends that the prosecutor's misstatement of the law in this case on two occasions amounted to prosecutorial misconduct and reversible error. The first instance of which appellant complains occurred when the prosecutor was discussing the lesser-included offense of second degree murder. The prosecutor said, "Second-[d]egree [m]urder does not fit because there is no proof whatsoever that he went out there intending to cause the death of [the victim.]" The defense objected. The trial court sustained the objection and told the prosecutor to "clear up" the misstatement. The prosecutor then read the definitions of knowingly and intentionally directly from the jury instructions on second degree murder. The prosecutor further stated,

My point that I'm trying to make[,] and I mis-stated it earlier[,] is simply that we do not intend to try to ask you to find the defendant guilty of First-Degree

Murder because he went out there intending to kill [the victim] because he did not. But he did during the course of the Aggravated Burglary that he intended to commit kill [the victim].

Contrary to appellant's assertion, the prosecutor did admit to the jury that he made a misstatement, and he attempted to clear up that misstatement. Based on the prosecutor's comments during the bench conference, any misstatement was unintentional. The trial court gave the jury a proper instruction for the lesser-included charge of second degree murder prior to closing arguments, and the jury had a copy of those instructions. We fail to see how this statement by the prosecutor prejudiced appellant in any way.

Appellant's second allegation of the prosecutor's misstating the law occurred during the State's rebuttal argument:

It's Felony Murder because it was carried out during the course of a dangerous felony. And why is Aggravated Burglary a dangerous felony? Because your home is sacred. Your home is sacrosanct. If you can't be safe in your home, where can you be safe? You have a right to be safe in your home[,] and you have a right to defend yourself as [the victim] vainly tried to do.

Recall back at the very beginning of the trial when I asked the question, how many jurors raised their hand that they had firearms in their home. And of those people that did have firearms in their home, how many jurors said for protection? Just think about that. [The victim] was in his home, asleep, he had his protection, his right to protection[,] and it didn't help him. That's why we have a law of Felony Murder on the books. Everyone has that right.

Appellant objected, and the trial court overruled the objection, saying, "A victim has a right to life, liberty, and the pursuit of happiness in his house[,] and I think that's the argument here."

Appellant now argues that the statements "prejudic[ed] the jurors against any thoughts that [appellant] could have legally returned fire in self-defense." We find nothing improper in the prosecutor's statements. The prosecutor was merely saying that everyone has the right to defend himself, not that appellant had to overcome a presumption that the victim was justified in shooting at him. *See Sims*, 111 S.W.3d at 9. Therefore, appellant is not entitled to relief as to this issue.

## CONCLUSION

Based on the record, the arguments of counsel, the parties' briefs, and controlling case law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE